**Richard M. GILMAN, et al., Plaintiffs,**

v.

**Edmund G. BROWN, Jr.,
et al., Defendants.**

**No. CIV. S–05–830 LKK/CKD.**

United States District Court,
E.D. California.

Signed Feb. 27, 2014.

Carter Capps White, King Hall Civil Rights Clinic UC Davis School of Law, Davis, CA, David M. Porter, FD, Matthew McCrary Scoble, Monica Knox, Office of the Federal Defender, Sacramento, CA, for Plaintiffs.

Christopher John Rench, Office of the Attorney General, Maria G. Chan, California Attorney General's Office, Sacramento, CA, Sara Romano, Office of the California Attorney General, San Francisco, CA, for Defendants.

## ORDER

LAWRENCE K. KARLTON, Senior District Judge.

Plaintiffs in this certified class action are inmates in California state prisons who are serving terms of life imprisonment with the possibility of parole. Plaintiffs assert that Propositions 9 and 89 have retrospectively increased their punishments, in violation of the *Ex Post Facto* Clause of the U.S. Constitution.

Proposition 9 amended California law to, among other things, increase the time between parole hearings. 2008 Cal. Legis. Serv. Prop. 9 (West), *amending in pertinent part,* Cal.Penal Code § 3041.5(b)(3) (extending deferral periods) and (b)(4) and (d) (advance hearings). The class challenging this Proposition consists of " 'all California state prisoners who have been sentenced to a life term with the possibility of parole for an offense that occurred before November 4, 2008.' " ECF No. 340 ¶ 1.

Proposition 89 amended the California Constitution to grant the Governor the authority to review parole decisions of California's Board of Parole Hearings (the "Board"), regarding parole decisions of prisoners convicted of murder. 1988 Cal. Legis. Serv. Prop. 89 (West), *amending* Cal. Const. Art. V, § 8. The class challenging this Proposition consists of " 'all California state prisoners who have been sentenced to a life term with possibility of parole for an offense that occurred before November 8, 1988.' " ECF No. 340 ¶ 2.

The matter came on for trial before the undersigned from June 27, 2013 through July 2, 2013. For the reasons that follow, the court finds that both Propositions, as implemented, have violated the *ex post facto* rights of the class members.

## I. THE *EX POST FACTO* CLAUSE

▮ "The Constitution prohibits both federal and state governments from enacting any 'ex post facto Law.'" *Peugh v. U.S.*, 569 U.S. ——, 133 S.Ct. 2072, 2081, 186 L.Ed.2d 84 (2013).[1] For purposes of this case, an "ex post facto" law is one "'that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.'" *Id.*, 133 S.Ct. at 2078 (*quoting Calder v. Bull*, 3 Dall. 386, 390, 1 L.Ed. 648 (1798)). "The key *ex post facto* inquiry is the actual state of the law at the time the defendant perpetrated the offense." *Watson v. Estelle*, 886 F.2d 1093, 1096 (9th Cir.1989). Accordingly, as relevant to this case, the *Ex Post Facto* Clause is violated if either Proposition, as implemented by the decision-maker—the Board in the case of Proposition 9, or the Governor in the case of Proposition 89—creates a "significant risk" that its retroactive application to the class would result in "a longer period of incarceration" for them than they would have received under the law in effect when their crimes were committed. *See Garner v. Jones*, 529 U.S. 244, 255, 120 S.Ct. 1362, 146 L.Ed.2d 236 (2000); *see also, Peugh*, 133 S.Ct. at 2084 (a "retrospective increase in the [Sentencing] Guidelines range applicable to a defendant creates a sufficient risk of a higher sentence to constitute an *ex post facto* violation").

## II. PROPOSITION 9: INCREASED TIME BETWEEN PAROLE HEARINGS

The focus of this court's inquiry is fairly narrow, thanks to a substantial body of law on the effect of the *Ex Post Facto* Clause on retrospective changes in the availability of parole hearings.

In *California Dept. of Corrections v. Morales*, 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995), the Supreme Court rejected an *ex post facto* challenge to a 1981 amendment to Cal.Penal Code § 3041.5. The amendment abolished mandatory annual parole hearings for prisoners convicted of more than one homicide, even when annual hearings were mandatory when the crimes were committed. Instead, the enactment authorized the parole board to defer subsequent suitability hearings for up to three years if the Board found that it was "not reasonable to expect that parole would be granted at a hearing during the following years." *Morales*, 514 U.S. at 503, 115 S.Ct. 1597.

*Morales* teaches that the mere fact that parole hearings are less frequent than they were when a prisoner's crime was committed, is not, by itself, sufficient to establish an *ex post facto* violation. Rather,

> the controlling inquiry ... was whether retroactive application of the change in California law created "a sufficient risk of increasing the measure of punishment attached to the covered crimes."

*Garner*, 529 U.S. at 250, 120 S.Ct. 1362 (quoting *Morales*, 514 U.S. at 509, 115 S.Ct. 1597); *Gilman v. Schwarzenegger*, 638 F.3d 1101, 1106 (9th Cir.2011) ("[a] retroactive procedural change violates the *Ex Post Facto* Clause when it 'creates a significant risk of prolonging [an inmate's] incarceration'").

Similarly, in *Garner*, the Supreme Court rejected an *ex post facto* challenge to the Georgia parole board's decision to do away with mandatory parole hearings every three (3) years. That board amended its rules so that it could defer parole hearings for up to eight (8) years. "[T]he Board's stated policy is to provide for reconsideration at 8–year intervals 'when, in the Board's determination, it is not reasonable

---

**1.** U.S. Constitution, Art. I, Sec. 10, cl. 1 ("No State shall ... pass any ... ex post facto Law"); U.S. Constitution, Art. I, Sec. 9, cl. 3 ("No ... ex post facto Law shall be passed").

to expect that parole would be granted during the intervening years.'" *Garner*, 529 U.S. at 254, 120 S.Ct. 1362. However, the Board "could have shortened the interval" had it wished to do so. *Id.* at 248, 120 S.Ct. 1362.

*Garner* teaches that no *ex post facto* violation will be found where parole hearings can be at longer intervals than was the case when the prisoner's crime was committed, but the parole board has the discretion to conduct hearings at the same interval it could when the prisoner's crime was committed.

Plaintiffs correctly point out that *Morales* and *Garner* are not directly on point, because the challenged law changes involved in those cases only *authorized* a longer deferral period, and only when the Board determined that parole was not likely to be granted in the intervening years. Proposition 9, on the other hand, does away with the previously authorized annual parole hearings in *all* cases, even if the prisoner conclusively showed that he would be suitable for parole in a year. *See Gilman*, 638 F.3d at 1108 ("Proposition 9 eliminated the Board's discretion to set a one-year deferral period, even if the Board were to find by clear and convincing evidence that a prisoner would be suitable for parole in one year").

In *Gilman*, the Ninth Circuit made clear that

Plaintiffs cannot succeed on the merits of their *ex post facto claim* unless (1) Proposition 9, on its face, created a significant risk of increasing the punishment of California life-term inmates, or (2) Plaintiffs can "demonstrate, by evidence drawn from [Proposition 9's] practical implementation ..., that its retro-

active application will result in a longer period of incarceration than under the [prior law]."

*Gilman*, 638 F.3d at 1106 (quoting *Garner*, 529 U.S. at 255, 120 S.Ct. 1362). The Ninth Circuit reversed this court's grant of a preliminary injunction for plaintiffs, finding that even if plaintiffs could show that there was a significant risk of longer incarceration under Proposition 9, plaintiffs failed to establish that the "advance hearing" procedure did not avoid that problem.

In a recent case addressing the Sentencing Guidelines, the Supreme Court made clear that it meant what it said in *Garner*, that is, a law that creates a sufficient risk of retrospectively increasing a prisoner's sentence is a violation of the *Ex Post Facto* Clause. *Peugh*, 133 S.Ct. at 2084.

## A. Increased Deferral Periods: Findings.

1. On November 4, 2008, California voters approved "Proposition 9," also known as "the Victims' Bill of Rights Act of 2008: Marsy's Law." *See In re Vicks*, 56 Cal.4th 274, 278, 153 Cal.Rptr.3d 471, 295 P.3d 863 (2013).

2. The law became effective "immediately," [2] and was made expressly applicable "to all proceedings held after" its effective date. 2008 Cal. Legis. Serv. Prop. 9, § 10 (West). The board, however, did not instantaneously implement the new law. Rather, the Board implemented the law— that is, started using Proposition 9 to determine the deferral periods—on December 15, 2008. Exh. 1 (ECF No. 259–1) at 7 (Exhibit A to Exh. 1).

3. As relevant here, Proposition 9 "amended section 3041.5 [of the California Penal Code] to increase the time between

---

2. According to *Vicks*, the law became effective "immediately." *Vicks*, 56 Cal.4th at 278, 153 Cal.Rptr.3d 471, 295 P.3d 863. The California Constitution provides that amendments effected by initiative become effective "the

day after the election unless the measure provides otherwise." Cal. Const. Art. XVIII, § 4; *Californians For An Open Primary v. McPherson*, 38 Cal.4th 735, 743, 43 Cal.Rptr.3d 315, 134 P.3d 299 (2006) (same).

parole hearings." *Vicks,* 56 Cal.4th at 283, 153 Cal.Rptr.3d 471, 295 P.3d 863.

4. Before Proposition 9, life prisoners received annual parole suitability hearings, as required by the prior versions of Cal.Penal Code § 3041.5, unless the Board found that it was not reasonable to expect that parole would be granted during the following year. In those cases, the Board deferred the next parole hearing for up to two years, and for up to five years for prisoners convicted of murder, as authorized by the old law. *See* 1994 Cal. Legis. Serv. Ch. 560, § 1 (S.B. 826) (West), *amending* Cal.Penal Code § 3041.5(b)(2)(A).

5. All the crimes for which Proposition 9 class members were convicted occurred before Proposition 9.[3] ECF No. 340 ¶ 1. The class members were all convicted and sentenced to life in prison with the possibility of parole, before Proposition 9. After Proposition 9, all Proposition 9 class members remained sentenced to life in prison

with the possibility of parole. *See* Undisputed Facts ("UF"), Final Pretrial Order (ECF No. 473) ¶ III(2) (hereinafter "UF ¶ 2").

6. In the two-year period before Proposition 9 was implemented, January 2007 through December 2008, the Board held approximately 6,550 parole suitability hearings for life prisoners. Parole was granted in approximately 6.4% of the hearings. Of the cases in which parole was denied, two-thirds resulted in one- or two-year deferrals; approximately 34.7 percent resulted in one-year deferrals and approximately 31.5 percent resulted in two-year deferrals. UF ¶ 5.

7. The deferrals for those years were governed by the 1994 amendments to Cal.Penal Code § 3041.5. 1994 Cal. Legis. Serv. 560 (SB 826) (West). Under that law, the Board was required to hold annual parole hearings unless "the Board finds that it is not reasonable to expect that parole would be granted at a hearing dur-

---

**3.** The court notes that crimes that could result in life terms that were committed at different times were covered by different versions of the parole hearings law. No party has suggested, or directed the court to evidence suggesting, that any class member's crime was committed at a time when there was no right to periodic review of parole hearings, or when the deferral periods were longer than those provided for in Proposition 9.

Before 1972, California prisoners had a right, established by case law, to "periodic" review of parole decisions, although there does not appear to have been any particular time period within which the review had to occur. *See In re Jackson,* 39 Cal.3d 464, 469–70, 216 Cal.Rptr. 760, 703 P.2d 100 (1985).

Between 1972 and July 1, 1977, California prisoners were entitled, by policy of the parole board, to annual parole reconsideration, " 'except in certain extreme cases where reconsideration of parole may be postponed for two or three years.' " *See Jackson,* 39 Cal.3d at 470, 216 Cal.Rptr. 760, 703 P.2d 100.

On July 1, 1977, the California Determinate Sentencing Law ("DSL") went into effect. *Watson,* 886 F.2d at 1094 (citing *Jackson,* 39

Cal.3d at 467, 216 Cal.Rptr. 760, 703 P.2d 100). Under this enactment, all inmates incarcerated on or after that date were statutorily entitled to annual parole hearings, without exception. *Id.*

In 1981, California enacted an exception to the annual parole review requirement, permitting the Board to defer the next parole hearing for three years if the prisoner had been convicted of "more than one offense which involves the taking of a life," and the Board found, stating its bases in writing, that it was "not reasonable to expect that parole would be granted at a hearing during the following years." *Watson,* 886 F.2d 1093. In 1990, California amended Section 3041.5 to "permit the Board to schedule the next hearing no later than 5 years after any hearing at which parole is denied if the prisoner has been convicted of more than 2 murders." 1990 Cal. Legis. Serv. 1053 (SB 560) (West). In 1994, California amended Section 3041.5 to "require that the hearing be held no later than up to 5 years after the hearing denying parole if the prisoner has been convicted of murder." 1994 Cal. Legis. Serv. 560 (SB 826) (West).

ing the following year." *Id.*[4] Therefore, it is a reasonable inference that the parole board found that for the life prisoners whose parole hearings came before them during that time, it *was* reasonable to expect that parole would be granted for 35% of them after one year.

8. Under the same law, where the Board found that an annual review was not warranted, it was required to impose a deferral of two years, unless "the Board finds that it is not reasonable to expect that parole would be granted at a hearing during the following years [up to five years for prisoners convicted of murder]." *Id.* Therefore, it is a reasonable inference that the Board found that for the 32% of life prisoners whose parole hearings resulted in two year deferrals during that time, it was reasonable to expect that parole would be granted for them after two years. Otherwise, the deferral periods would have been 3, 4 or 5 years pursuant to the statute.

9. It is, further, a reasonable inference that of all the inmates who had parole hearings during the two years prior to implementation of Proposition 9, about two-thirds of them were determined by the Board to be ready for parole within one or two years.

10. In the two-year period after Proposition 9 was implemented, January 2009 through December 2010, the Board held approximately 6,100 hearings. At those hearings, parole was granted in approximately 17 percent of the cases.[5] Of the cases in which parole was denied, approximately 48.4 percent resulted in the lowest deferral possible under Proposition 9, three years. UF ¶ 6.[6]

11. For the period 2007 to 2008, before the passage of Proposition 9, the average deferral period for all life prisoners who were denied parole at their hearing, was 2.3 years. *See* Plaintiffs' Exh. 51.[7] Approximately 35% of those deferrals were for the minimum period allowed by law, one year. An additional 32% of the deferrals were for two years. UF ¶ 5.

12. Following the passage of Proposition 9, the average deferral periods for all life prisoners decided under the new law were as follows: 4.84 years in 2009; 5.11 years in 2010; 5.08 years in 2011; 4.42 years in 2012. *See* Defendants' Exh. U.[8]

---

**4.** The court is aware of the evidence in the record indicating that some prisoners agree that they are not currently suitable for parole, and "stipulate" to a deferral period of, say, one year. Neither side has directed the court's attention to any evidence that in such cases the Board agrees to such a stipulation even when it is not reasonable to expect that parole would be granted during that year. Nor has either side directed the court's attention to evidence showing what percentage of these 6,550 deferrals were stipulated. Accordingly, the court does not, for these purposes, distinguish between stipulated deferrals and those imposed by the Board.

**5.** Neither side offers an explanation for why the parole rate almost trebled. With no evidence on it, there is no way for the court to consider this fact except to speculate. For example, the Board may have been reluctant to impose a 3-year deferral on someone it believed would be ready for parole within the year, and therefore granted parole immediately. Or, there could simply have been a backlog of inmates ready for parole. However, this is entirely speculation, and plays no part in the court's decision.

**6.** The parties included a recounting of several cases, in which the prisoners requested advanced hearings. To the degree the cases seem relevant to an issue in the case, they are discussed or footnoted below.

**7.** This number is the weighted average of the deferral periods disclosed in Plaintiffs' Exhibit 51. The average is a little fuzzy, because Exhibit 51 does not specify what dates in 2007 to 2008 are included.

**8.** These numbers are the weighted averages of the deferral periods disclosed in Defendants' Exhibit U.

Almost 56% of those deferrals were for the minimum period then allowed by law, three years. *See* Defendants' Exh. U.

### B. Increased Deferral Periods: Conclusions.

■ The evidence shows that the average deferral times for Proposition 9 class members has increased since the implementation of that law. The Ninth Circuit cautioned, however, that it was not correct simply to assume that "more frequent parole hearings produce more frequent *grants* of parole rather than more frequent *denials* of parole." *Gilman*, 638 F.3d at 1108 n. 6 (emphasis in text).

The evidence adduced at trial shows however, that the increased deferral periods did not happen randomly, or only to those prisoners least likely to be granted parole. Rather, the evidence shows that in the two years prior to Proposition 9, the Board imposed deferral periods of one or two years on two-thirds of all the prisoners who were denied parole. These are the prisoners who are the *most* likely to be paroled within a year or two. That is because the statute in effect at the time contemplated that the Board would grant deferrals of one or two years only when there was a reasonable expectation that the prisoner would be ready for parole within that time. *See* 1994 Cal. Legis. Serv. 560 (West).

Of course, those prisoners were under no guarantee of release on parole. However, if the statute had any meaning, and the Board applied the statute as written, then it is a reasonable inference that there existed a reasonable expectation that those prisoners would be paroled within the following year or two, if they could get to a parole hearing during that time. Yet, under Proposition 9, these same prisoners cannot get to a hearing before at least three years, the new minimum deferral period. Cal.Penal Code § 3041.5(b)(3)(C). It follows that since there was a reasonable expectation that these prisoners would be paroled within one or two years, but Proposition 9 prevents them from getting to a hearing before three years, there is a significant risk that their incarcerations are being lengthened by Proposition 9.

Even as to those prisoners who received deferral periods of three, four or five years under the old law, Proposition 9 has created a significant risk of longer incarceration. Under the old law, deferrals of three or four years would be imposed if the Board determined that there was a reasonable expectation that the prisoner would be paroled during that time. In other words, at the time their crimes were committed, these prisoners' incarcerations (beyond a minimum term), were to continue only as long as the Board found that the prisoner was not suitable for parole.

Under Proposition 9 however, the prisoner's incarceration would continue indefinitely, unless the Board found "clear and convincing evidence" that he was suitable for parole in 3, 5, 7 or 10 years.[9] "Clear and convincing evidence," the Proposition 9 standard, refers to a quantum and quality of evidence that "could place in the ultimate factfinder an *abiding conviction* that the truth of its factual contentions are *'highly probable.'*" *Colorado v. New Mexico*, 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984) (emphases added).

Since the old law and Proposition 9 are thus governed by these two completely different standards, it is quite possible that a prisoner could satisfy the old-law stan-

---

**9.** No particular showing is required, under Proposition 9, to get a hearing after a 15–year deferral.

dard, but *never* satisfy the Proposition 9 standard.

Indeed, this logically seems to be at greatest risk when dealing with those subjected to the longest deferral periods, those deferred for 3, 4 or 5 years under the old law. Such prisoners, independently of how often they could get to a parole hearing, would have little chance of ever giving the Board an "abiding conviction" that it was "highly probable" that they were suitable for parole.

The court therefore concludes that Proposition 9 has created a significant risk of imposing a longer incarceration on the class than was the case when their crimes were committed. This conclusion is drawn from the evidence presented at trial, and the reasonable inferences arising from it. However, the plaintiffs further attempted to buttress their case by presenting actual accounts of prisoners whose incarcerations, they assert, were lengthened by Proposition 9. It is to that showing that court now turns, keeping in mind that at the preliminary injunction stage, the Ninth Circuit found that plaintiffs had, to that date, "produced no evidence to support a finding that more frequent parole hearings result in more frequent grants of parole." *Gilman*, 638 F.3d at 1108 n. 6.

### C. The *Rutherford* Litigation: Findings.

A somewhat detailed description of the *Rutherford* litigation is useful because plaintiffs argue that a subset of the class certified in *In re Rutherford* (Cal.Super. Ct., Marin County, No. SC135399A), is representative of the Proposition 9 class certified in this case, while defendants ar-

gue that there is insufficient evidence to conclude that the *Rutherford* subset is representative. Describing how the *Rutherford* class and subset came into being is helpful in determining whether the *Rutherford* subset is representative of the Proposition 9 class in this case.

13. On February 25, 2003, California life prisoner Jerry Rutherford was denied parole, and given a one-year deferral until his next hearing, pursuant to Cal.Penal Code § 3041.5, as it then existed. *See In re Lugo*, 164 Cal.App.4th 1522, 1529, 80 Cal.Rptr.3d 521 (1st Dist.2008).[10] However, the Board failed to provide Rutherford a parole hearing during the next year, although required to do so by the law in effect at the time. Exh. 53 (admitted, over objection, at RT 30) (ECF No. 343–9) ("Stipulated Testimony of Thomas Master") ¶ 2.[11]

On May 26, 2004, Rutherford filed a petition for habeas corpus in California state court, *In re Rutherford* (Cal.Super. Ct., Marin County, No. SC135399A), challenging the delay in his parole hearing. *Lugo*, 164 Cal.App.4th at 1529, 80 Cal. Rptr.3d 521.

15. On November 29, 2004, the California Superior Court hearing *Rutherford* certified a class of "all prisoners serving indeterminate terms of life with the possibility of parole who have approached or exceeded their minimum eligible parole dates without receiving their parole hearings within the time required by sections 3041 and 3041.5." *Lugo*, 164 Cal.App.4th at 1530, 80 Cal.Rptr.3d 521.

**10.** Petitioner Lugo was substituted in as class representative after Rutherford's death. *Id.*, at 1532, 80 Cal.Rptr.3d 521.

**11.** The parties stipulated that, if called to testify, Thomas Master would testify as described in Exhibit 53. ECF No. 343–9. At trial, with

Master on the stand, defendants objected to the Stipulated Testimony on hearsay grounds. RT 30. The objection was overruled because Master was on the stand and was available to be cross-examined on the Stipulated Testimony. *Id.*

16. After the *Rutherford* class was certified, "the Board stipulated that it was not providing timely parole consideration hearings as required by the Penal Code." *Lugo*, 164 Cal.App.4th at 1530, 80 Cal.Rptr.3d 521.

17. On March 22, 2006, the parties agreed to a remedial plan intended to reduce the backlog of parole hearings. *Lugo*, 164 Cal.App.4th at 1532, 80 Cal. Rptr.3d 521.

18. When Proposition 9 was implemented, on December 15, 2008, life prisoners were still having their parole hearings delayed beyond the dates when they should, by law, have occurred. Because of this general timeliness problem the Board was having, there arose a subset of the *Rutherford* class ("the *Rutherford* subset"), who should have had their parole hearings conducted under the old law, before Proposition 9's implementation, but who in fact did not (or would not) receive their hearings until after implementation. *See* Exh. 1, Exhibit A (*Rutherford* Stipulation) (ECF No. 259–1) at 7 (admitted over objection at RT 26). Their hearings were (or were scheduled to be) conducted under Proposition 9.

19. To avoid having their hearings decided under Proposition 9, the *Rutherford* subset sought a preliminary injunction enjoining the Board from implementing Proposition 9 as to them. *See id.*, Exhibit A at 7.

20. The preliminary injunction proceeding was settled with a stipulation. Prisoners who qualified for the stipulation were those prisoners in the *Rutherford* subset whose pre-Proposition 9 hearings were delayed until after Proposition 9, because of reasons attributable to the State, or because of "exigent circumstances," [12] and those whose hearings commenced before Proposition 9, but which were continued to a date after Proposition 9. Exh. 1, Exhibit A at pp. 9–10 ¶ 4(a)–(d); Exh. 53 at ¶ 6. Excluded from this stipulation were those *Rutherford* subset members who were granted parole or who elected to waive or postpone their hearings through no fault of the Board or exigent circumstances. Exh. 53 ¶ 6.

21 Under the stipulation, all qualifying *Rutherford* subset members who should have had their parole hearings conducted before December 15, 2008 under the old law, were granted hearings governed by the old law, even if those hearings occurred after the implementation of Proposition 9. Master Decl. (Exh. 1) ¶ 5. Further, in the event the life prisoner's delayed hearing had already been conducted under Proposition 9, and parole had been denied, the Board agreed to re-calculate the deferral period using the old law. *Id.*[13] In other words, the 3–,

---

**12.** Exigent circumstances are (a) natural disaster, (b) institution security or medical lockdown/quarantine, (c) illness or emergency of an essential party, (d) power outage or equipment failure, (e) prisoner medically or psychiatrically unavailable, attorney not prepared to proceed or became unavailable after hearing was scheduled. Exhibit A at p. 9 ¶ 4(c) & p. 14. This group includes prisoners who postponed their hearings to a date before Proposition 9, but the hearing was not provided before Proposition 9.

**13.** Some covered prisoners chose to stipulate to a deferral period, rather than go forward with their delayed, Proposition 9 parole hearing. In those cases, all the new, old-law deferral periods were set by agreement. Master Decl. ¶ 10. For those convicted of murder: all 3–year stipulations were converted to 1–year, 5–year stipulations to 2–years, 7–years to 3–years, 10–years to 4–years, and 15–years to 5–years. Master Decl. ¶ 10. For those not convicted of murder: all 3–year stipulations were converted to 1–year (identically with those convicted of murder), and all other stipulated deferrals (5–, 7–, 10– and 15–year deferrals), were converted to 2–year deferrals. *Id.*

5–, 7–, 10– and 15–year deferrals under Proposition 9 would be recalculated to 1–, 2–, 3–, 4– or 5–year deferrals under the old law.

22. The parties in *Rutherford* stipulated that 442 such prisoners, identified at Exh. 20 (admitted per PTO), were covered by the stipulation. UF ¶ 14; (RT 26–29, Master testimony).

23. Of the 442 prisoners who received the modifications, 305 had, as of March 2011, received their subsequent hearings after the modifications; of those 305 prisoners, 51 (16.7%) were granted parole at their hearings. UF ¶ 15.

24. In addition to the 442 prisoners who received modifications of their Proposition 9 deferrals to old-law deferrals due to the *Rutherford* litigation, there were 408 other prisoners who had been entitled to their hearings before Proposition 9 but had not yet had their hearings at the time Proposition 9 was implemented; pursuant to a stipulation in the *Rutherford* case, those prisoners' first post-Proposition 9 hearings were to be governed by the old law. As of April 6, 2011, of those 408 prisoners, 247 were denied parole and given old-law (one- to five-year) deferrals. As of April 6, 2011, 88 of the 247 had reached their next hearing (because they had received only one- or two-year deferrals at their first post-Proposition 9 hearings), and 25 (28 percent) were granted parole at their hearings. UF ¶ 16.

25. Of the 240 prisoners in the *Rutherford* subset who received or stipulated to the minimum 3–year deferral under Proposition 9, (a) 102 had their deferral dates reduced to the minimum 1–year deferral in a hearing under the old law,[14] (b) 60 had their deferral dates reduced to a 2–year deferral (the second-shortest deferral) in new hearings under the old law, and (c) none had their deferral dates stay the same or get increased using the old law. Exh. 20 (admitted per PTO).[15] Parole was granted in 43 of those cases. Exh. 54 (admitted at RT 32).[16] As noted above, the Board's decision to defer a parole hearing for only one or two years is made when there is a reasonable expectation that the prisoner will be granted parole during the next year or two. The conclusion appears to be inescapable, then, that for most of those 240 prisoners (that is, 162 of them, which excludes those subject to the agreed-to deferrals), there was a reasonable expectation that they would be granted parole in one or two years. Yet, if their Proposition 9 deferrals had stood, they would have been unable to even get to a parole hearing for three years.

26. Of the 104 prisoners in the *Rutherford* subset who received or stipulated to a five (5) year deferral under Proposition 9, seventy-four of them had their deferral periods re-calculated under the old law.[17] As a result, (a) one had the deferral reduced to the 1–year minimum, (b) forty-

14. An additional 78 *stipulated* to parole unsuitability for 3 years at their Proposition 9 hearings. Exh. 20 at 43–49 (entries with "S" in the decision column are these stipulations). In that case, the old-law deferral period was reduced to one year by agreement, apparently without the need for a new hearing conducted under the old law. Exh. 1 at 10 ¶ 10.

15. Exhibit 20 is a chart of the prisoners covered by the *Rutherford* stipulation. It includes a column that shows the original deferral date calculated under Proposition 9 ("Original Hearing Info / Result Length"),

and a column that shows the new deferral date, calculated under the old law ("Modified Hearing Info / Length"). *See* RT 27–28.

16. Exhibit 54 is a summary chart showing parole grants after the *Rutherford* modifications.

17. An additional thirty of these prisoners stipulated to 5–year deferrals under Proposition 9, and so their deferrals were reduced to 2–year old-law deferrals by agreement. *See* Exhibit A, ¶ 10.

eight had their deferrals reduced to two years, the next-shortest available, (c) seventeen had their deferrals reduced to 3 years, and (d) eight had their deferrals reduced to 4 years in new hearings conducted under the old law. None had their deferrals stay the same, and it was not possible to get a greater deferral under the old law. Exhs. 20 & 54. Therefore, for most of these prisoners (74, which excludes those subject to agreed-to deferrals), there was a reasonable expectation that they would be granted parole in one to four years. Yet, if their Proposition 9 deferrals had stood, they would have been unable to even get to a parole hearing for five years.

27. Of the 53 prisoners in the *Rutherford* subset who received or stipulated to a seven (7) year deferral under Proposition 9, thirty-nine had their deferral periods recalculated under the old law.[18] As a result, (a) none received either the 1–year minimum or the 5–year maximum deferral, (b) six had the deferral reduced to 2 years, the next shortest deferral under the old law, (c) seventeen had their deferrals reduced to three (3) years, and (d) 16 had their deferrals reduced to 4 years. Exhs. 20 & 54. It was not possible to get an equal or longer deferral under the old law. Therefore, for most of these prisoners, there was a reasonable expectation that they would be granted parole in one to four years. Yet, if their Proposition 9 deferrals had stood, they would have been unable to even get to a parole hearing for seven (7) years.

28. The 31 prisoners in the *Rutherford* subset who received a ten (10) year deferral (the next-to-longest deferral possible) under Proposition 9, all had their deferrals re-calculated under the old-law.[19] As a result, (a) none received the 1–year minimum deferral, (b) somewhat surprisingly, six (6) had the deferral reduced to 2 years, the next shortest deferral under the old law,[20] (c) 20 had their deferrals reduced to four (4) years and (d) 5 had their deferrals reduced to 5 years, the maximum deferral under the old law. Exhs. 20 & 54. It was not possible to get an equal or longer deferral under the old law.

29. Therefore, for the majority of these prisoners (26 out of 31), there was a reasonable expectation that they would be granted parole in one to four years. Yet, if their Proposition 9 deferrals had stood, they would have been unable to even get to a parole hearing for ten (10) years.

30. Of the 14 prisoners in the *Rutherford* subset who received the maximum, 15–year deferral under Proposition 9, (a) none received the 1–year minimum deferral, (b) somewhat remarkably, five (5) had the deferral reduced to 2 years, the next shortest deferral under the old law, (c) none had their deferrals reduced to 3 years, (d) one had the deferral reduced to four (4) years and (d) eight (8) had their deferrals reduced to 5 years, the maximum deferral under the old law. Exhs. 20 & 54. It was not possible to get an equal or longer deferral under the old law.

31. Thus, most of those who received the maximum, 15–year, deferral under

---

18. An additional fourteen of these prisoners stipulated to 7–year deferrals under Proposition 9, and so their deferrals were reduced, by agreement, to 2–year old-law deferrals, or 3–year old-law deferrals if their convictions were for murder. *See* Exhibit A, ¶ 10.

19. According to Exh. 20, none of these prisoners stipulated to deferrals under Proposition 9.

20. This is the old-law deferral these six would have received by agreement, if they had stipulated to deferrals under Proposition 9, and if their commitment offenses were other than murder. Without this agreement, it seems surprising that their next-to-longest deferrals would be re-calculated to the next-to-shortest level.

Proposition 9, also received the maximum, 5–year, deferral under the old law. The law thus imposed an irrebutable presumption on these prisoners that they would not be suitable for parole for 15–years, removing the old-law possibility that at least every five years, the prisoner could demonstrate suitability.

32. As for the five prisoners whose deferrals dropped from 15 years under Proposition 9 to 2 years under the old law, the reduction seems remarkable because having received the maximum, 15–year deferral under Proposition 9, these five prisoners received the next shortest deferral available under the old law. It is a reasonable inference from this that in December 2008 and January 2009, the Board did not have "clear and convincing evidence" that those prisoners would be ready for release for the next 15 years. Yet, making the calculation under the old law about three months later (in March and April 2009), the Board concluded that these same prisoners would be ready for release within 2 years. Exh. 20.

33. These five prisoners may thus have played out the disturbing scenario mentioned earlier, namely that prisoners who would be paroled under the old law could *never* show with the "clear and convincing evidence" required by Proposition 9, that they were ready for parole.[21]

34. There exists a separate group of 408 prisoners who also had post-Proposition 9 deferrals decided under the old law.

Exh. 56 (ECF No. 343–12) (admitted at RT 117). Of the 247 prisoners in that group who were denied parole, 91 received the minimum one-year deferrals, and 22 of them were granted parole. *Id.* Of the group, 87 received 2 year deferrals (the next shortest under the old law), and 2 of them were granted parole. *Id.*

35. The actual effect of Proposition 9 on a sample group of life prisoners affected by the *Rutherford* litigation is set forth below. *See* Exh. 20 & 55 (binder) (all columns except the last two admitted at RT 222–23).[22]

a. Life prisoner A. Taylor (Exh. 20 ¶ 300) received a Proposition 9 parole hearing in January 2009. Taylor was denied parole, and given the minimum deferral permitted under Proposition 9, three years, on January 2012. However, because the prisoner was covered by the *Rutherford* litigation, the Board re-calculated the deferral, using the old law. Using the old law, the Board deferred Taylor's hearing two (2) years, or until January 2011. This meant that the Board believed that there was a reasonable chance that the prisoner would be granted parole in two years (otherwise, it was required by the old law to defer the hearing 3, 4 or 5 years). In fact, the Board granted Taylor parole at the January 2011 hearing, and the prisoner was released on parole in June 2011. Thus, Taylor was released under the old law before a parole hearing could even have occurred under Proposition 9.[23]

---

21. These five (Ambers, Pinell, Storey, Case and Martin) are not recorded as having stipulated to a deferral. *See* Exhibit 20. Had they stipulated, and if their crimes were other than murder, then the deferral would have dropped from 15 years to 2 years under the *Rutherford* agreement.

22. The court determined that the last two columns, although not admitted as evidence, represented what the witness, Monica Knox,

would have testified to, if the court were inclined to drag out the trial. RT 222–23. Defendant was granted the opportunity to cross-examine the witness on those columns *as if she had so testified in court.*

23. Similar results obtain for seven (7) other life prisoners identified by plaintiffs, namely, P. Guerrero, J. Morales, R. Willis, R. Morton, R. DeCid, N. Powell and G. Balaoing.

b. Life prisoner H. Tuey (Exh. 20 ¶ 152) received a Proposition 9 parole hearing in December 2008. Tuey was denied parole, and given the minimum 3–year deferral permitted under Proposition 9, to December 2011. However, because the prisoner was covered by the *Rutherford* litigation, the Board re-calculated the deferral under the old law. Using the old law, the Board gave Tuey the minimum 1–year deferral, to December 2009. This meant that the Board believed that there was a reasonable chance that Tuey would be granted parole the following year (otherwise, it was required by the old law to defer the hearing 2, 3, 4 or 5 years). In fact, the Board granted Tuey parole at the December 2009 hearing, and the prisoner was released on parole in May 2010. Thus, Tuey was released under the old law one and one-half years before the next parole hearing could even have occurred under Proposition 9.[24]

c. Life prisoner A. Flores (Exh. 20 ¶ 302) received a Proposition 9 parole hearing in December 2008, but was denied parole, and given a seven (7) year deferral, to December 2015. Under Proposition 9, this deferral is given when the Board finds "by clear and convincing evidence" that the prisoner need not be incarcerated for more than seven additional years. Under this circumstance, the Board had the choice of deferring for 3, 5 or 7 years. Because the prisoner was covered by the *Rutherford* litigation, the Board re-calculated the deferral under the old law. Using the old law, the Board gave Flores a 3–year deferral, to December 2011. This

meant that the Board believed that there was a reasonable chance that Flores would be granted parole in three years, (otherwise, it was required by the old law to defer the hearing 4 or 5 years). In fact, the Board granted Flores parole at the November 2011 hearing, and the prisoner was released on parole in May 2012. Thus, Flores was released under the old law three years before the next parole hearing that had been granted under Proposition 9.

d. Life prisoner C. Orduna (Exh. 55 ¶ 19) received a Proposition 9 parole hearing in March 2009. Orduna was denied parole, and given a five (5) year deferral, to March 2014. Under Proposition 9, this deferral is given when the Board finds "by clear and convincing evidence" that the prisoner need not be incarcerated for more than five (5) additional years. Under this circumstance, the Board had the choice of deferring for 3, 5 or 7 years. Because the prisoner was covered by the *Rutherford* litigation, the Board re-calculated the deferral under the old law. Using the old law, the Board gave Orduna a 2–year deferral, to 2011. This meant that the Board believed that there was a reasonable chance that Orduna would be granted parole in two years, (otherwise, it was required by the old law to defer the hearing 3, 4 or 5 years). In fact, the Board granted Orduna parole at the April 2010 hearing, and the prisoner was released on parole in October 2010.

Thus, Orduna was released under the old law before the earliest date the next parole hearing could even have occurred under Proposition 9.[25]

---

**24.** Similar results obtain for 42 other life prisoners identified by plaintiffs, namely, I. Kegler, R. Anderson, Curry, M. Arthur, S. Law, P. Syzemore, D. James, R. Hamilton, C. Henderson, G. Zavala, R. Perez, R. Stewart, O. Boone, C. Salgado, G. Rounds, G. Counts, A. Saucedo, A. Marin, E. Reams, B. Barnard, S. Pacheco, B. Jackaway, J. Anderson, J. Moreno, J. Acosta, B. Weatherly, T. Davis, J. Ma-

soner, D. Cordar, A. Harrell, Racca, M. Gaona, D. Schlappi, H. Oropeza, A. Garcia, E. Russell, Kwitkowski, J. Bonilla, R. Espinola, J. Crespo, F. Hill and A. Hanna.

**25.** Similar results obtain for 4 other life prisoners identified by plaintiffs, namely, C. Luong, J. Barrigan, M. Luna and M. Bunney.

36. An additional group of 24 life prisoners had their 3–year Proposition 9 deferrals (the minimum permitted under Proposition 9), reduced through individual court orders.[26] *See* Exh. 58 (binder) (all columns except the last two admitted at RT 222–23).[27] Each of these life prisoners received parole hearings earlier than would have been permitted under Proposition 9, and each was released on parole before they even could have had a parole hearing under Proposition 9. *Id.*

37. Dr. Barry Krisberg was qualified to testify as an expert on criminology, sociology and statistics. (RT 73–74.) Dr. Krisberg opined that there was no systematic bias in the *Rutherford* subset that would make it different from the class in this case. (RT 76.)

38. According to Dr. Krisberg, "comparing the outcomes of the Rutherford Group to the class as a whole is a valid research design to determine the effect of the new law." (RT 85.)

39. Dr. Stephen Klein was qualified to testify as an expert in statistics. (RT 100.) Dr. Klein opined that "it's too soon to know what the effects of Proposition 9 are." (RT 101.) Dr. Klein disagreed with Dr. Krisberg that the *Rutherford* subset was unbiased, or was representative of the plaintiff class as a whole. Dr. Klein believed that Dr. Krisberg erred by not "controlling" the *Rutherford* subset for "case characteristics."

40. Dr. Klein identified two factors that, he opined, defeated Dr. Krisberg's assertion that the *Rutherford* subset was an unbiased "natural experiment," and was therefore representative of the class as a whole. The first is Dr. Klein's assertion that the hearing mandated by the *Rutherford* litigation "could be two years" after the initial post-Proposition 9 hearing. RT 106. Neither Dr. Klein nor defendants' counsel ever identified any document or other evidence from which he drew this "two years" figure.

41. The other factor Dr. Klein identified is that "the people doing the second hearing may or may not have known the outcome of the first hearing, and that could be affecting things." (RT 106.) Dr. Klein does not identify any law, document or other evidence indicating that the decision-makers in the second hearing knew the outcome of the first hearing.[28] Nor

The court rejects, however, Knox's testimony of what is the "earliest release" date under Proposition 9 for several prisoners. *See* Exh. 55. According to Knox's testimony, this was the earliest release date if the prisoner "had gotten the shortest Prop 9 deferral possible." RT 219. The shortest deferral possible under Proposition 9 was three (3) years. *See* Cal. Penal. Code § 3041.5(b)(3)(C) (defer for 3, 5, or 7 years if prisoner does not require incarceration for more than seven additional years). However, it appears that Knox used the actual deferral given under Proposition 9 rather than the "shortest" deferral possible, in her calculation.

This apparent error was avoided in the calculation for J. Alvarez, but repeated for J. Coleman, B. Jimenez, C. Luong, B. Martinez, J. Barrigan, C. Escobar, M. Luna, P. Velazquez, M. Bunney and G. Tuzon. However, even correcting these errors, Orduna, Luong, Barrigan, Luna and Bunney were released under the old law sooner that they could even have gotten a parole hearing under Proposition 9.

26. L. Garcia, A. Marcelo, A. Criscione, A. Bics, S. Murphy, R. Young, J. Powell, M. Fairfax, E. Juarez, R. Hudson, J. Alexander, D. Kurtzman, R. DeLaBarcena, M. Berger, I. Sepulveda, M. Barajas, O. Willis, H. Rosales, A. Aguilar, S. Contreras, E. Estrada, J. Portillo, H. Jimenez and L. Liftee. Exh. 58.

27. Once again, the court found that the last two columns represented what the witness, Monica Knox, would have testified to, if the court were inclined to drag out the trial. Defendant was granted the opportunity to cross-examine the witness on those columns as if she had so testified in court.

28. Under Proposition 9, the Board is expressly directed to consider the findings and conclusions "reached in a prior parole hearing," although it is not binding. Even assuming a

does he identify any document or evidence showing that knowing the prior outcome would make any difference to the second decision-makers.

42. Dr. Klein opined that in order for Dr. Krisberg's "natural experiment" to be valid, "[w]hat you'd want to do is you want to get the characteristics of the Rutherford Group and the characteristics of the non-Rutherford group in the larger population to see whether those characteristics are the same." (RT 108–09.) Dr. Klein concluded that because Dr. Krisberg did not do this, his "natural experiment" was not valid. Dr. Klein did not identify any case characteristics between the two groups that were different, or that could affect the outcome.

## D. The *Rutherford* Litigation: Conclusions.

The court finds that Dr. Klein's testimony does not really bear on the question before the court, namely, whether Proposition 9 created a "significant risk" of longer incarceration. This is not the same as waiting to see what the different lengths of incarceration are, years from now, and *looking back* to see whether they were longer after Proposition 9 passed. The question is whether, *looking forward,* there is a significant risk of increased incarceration. If the court were to rely upon Dr. Klein's testimony, this court could not reach any conclusion about the constitutionality of Proposition 9 until some time in the indefinite future when all the class members had either been released or died.

Even if Dr. Klein's testimony were pertinent, the court rejects it. Dr. Klein opines that there is no way for Dr. Krisberg to know that the *Rutherford* subset is representative of the class as a whole. The basis for this opinion is that Dr. Kris-

berg did not "control" for case characteristics. Because of this, Dr. Klein opines, there is no way to know whether something other than the accident of calendaring—such as individual case characteristics, or some biasing factor that caused the "accident" of calendaring—distinguishes the *Rutherford* subset from the class here.

There are several problems with this assertion. First, neither the defendants nor Dr. Klein offer any evidence of any case characteristics that would distinguish the *Rutherford* subset from the class. Defendants have access to all the prisoners' central files, and yet they have not identified any of the differences that Dr. Klein speculates might possibly exist. The court infers from this failure to produce any such evidence, that there is none.

Second, the evidence before the court plainly shows that there is no overall difference that would make a difference between the *Rutherford* subset and the class. Dr. Klein identifies two possible differences in case characteristics. He asserts that "the time between the two hearings could be two years, things could happen that would be affecting whether somebody got a parole grant during that two-year period." RT 106.

This basis is flatly contradicted by the evidence. Exhibit 20 is the defendants' own compilation of every member of the *Rutherford* subset. It shows that in almost every single case, the time between the two hearings for the *Rutherford* prisoners is just under one month (*e.g.,* Tilford), to just under five (5) months (*e.g.,* Hill), with the overwhelming majority being about 3 or 4 months apart. Exhibit 20. In only two cases that the court was able to identify, namely, Harrell (11 months)

similar direction applied under the old law or regulations, it is not clear that the vacated

hearings in *Rutherford* would qualify as a prior parole hearing.

and Moore (10 months), was the time difference greater than 5 months.

If Dr. Klein's assertion had been based upon actual evidence in the case, the court would consider it, since the time between hearings, and possibility of changes in case characteristics that could occur during that time, most notably "institutional behavior," is pertinent to whether parole would be granted. *See* Cal. Admin. Code, tit. 15, § 2281(d)(9) (finding of suitability for release is better when "[i]nstitutional activities indicate an enhanced ability to function within the law upon release"). Since Dr. Klein's assertion was based upon an apparently made-up number of "years" between the initial Proposition 9 hearing and the old-law hearing gained through the *Rutherford* litigation, the court must discard Dr. Klein's opinion, as to this factor.

Finally, the evidence before the court tends to show that the *relevant* case characteristics were not different between the two groups. This conclusion can be inferred from the fact that the case characteristics that matter are set forth in the regulations governing the determination of parole suitability, *id.* § 2281(b)–(d), and the fact that both groups wound up with the full range of outcomes. In other words, the case characteristics are inferable from the outcome. If the *Rutherford* subset was, for example, crowded with multiple murderers who showed no remorse, there would be few among them receiving the minimum deferral, and many receiving the maximum. But defendants have identified no such skewing in the distribution of outcomes in the record.

The court finds that the *Rutherford* subset is representative of the Proposition 9 class as a whole. The evidence submitted on this matter shows that the *Rutherford* subset is distinguished from the Proposition 9 class only by the accident of when their parole hearings were scheduled on the calendar. There is no evidence that the case characteristics are different between the two groups. There is no evidence that something about the accident of calendaring was anything other than an accident of the calendar.

For example, there is no evidence that only those most or least likely to be paroled moved into the *Rutherford* subset. Rather, the evidence is clear that the *Rutherford* subset came into existence because the Board had a backlog that applied to *all* life prisoners, not any particular subset of them based upon any case characteristics. Dr. Klein's speculation on possible differences in case characteristics is therefore a red herring, especially since Dr. Klein, who presumably had access to the central files of the class as well as the *Rutherford* group, did not identify a single case characteristic that distinguished the two groups.

The court therefore finds that plaintiffs have properly buttressed their showing that Proposition 9 actually did create a significant risk that their incarcerations would be lengthened. In addition to the inferences to be drawn from how the Board imposes deferral periods, the *Rutherford* subset shows that in fact, some members of the class had their incarcerations lengthened by Proposition 9, but were rescued from that result by the *Rutherford* stipulation.

The experience of the *Rutherford* subset thus shows that while it is true that more frequent parole hearings result in more frequent denials for some, it is also true that they result in more frequent grants of parole for others.

## III. PROPOSITION 9: THE "ADVANCED HEARING" PROCESS

### A. Findings.

43. A life prisoner who has been denied parole may request that the Board exer-

cise its discretion to advance a hearing to an earlier date. *See* UF ¶ 4.

44. From the passage of Proposition 9 through April 6, 2011, when a full review of a petition to advance was ordered, the review was conducted by a Board employee at the prison where the prisoner was housed so that the prisoner's entire file could be reviewed. The prisoners were not present or represented by counsel when their files were reviewed. UF ¶ 13.

45. During the period from January 1, 2009 through December 31, 2010, there were 119 petitions to advance filed by prisoners. Of those, 114 (approximately 96%) were denied; 106 (approximately 93%) were summarily denied and eight (approximately 7%) were denied following a full review. UF ¶ 7.

46. From 2009 to June 2012, the Board has not exercised its discretion to advance a hearing absent a prisoner filing a petition to advance. UF ¶ 26.

47. Although the procedure for making this request does not appear to be reflected in the Board's official regulations, the Board's Executive Officer, Jennifer Shaffer, testified about the Board's process for determining whether an expedited hearing is warranted for a particular inmate. (RT 263–95.)

48. The prisoner starts this process by completing Form 1045, Exhibit 35 (ECF No. 341–3), entitled "State of California / Board of Parole Hearings / Petition To Advance Hearing Date." (RT 265.) The form instructs the prisoner to list the changed circumstances or new information that "show a reasonable likelihood that consideration of the public and victim's safety does not require the additional peri-od of incarceration" that was set at the last parole suitability hearing. Exh. 35 at BPH–44. The prisoner is also instructed to submit with the petition all supporting documents. *Id.*[29]

49. Prior to March 1, 2014, the submitted petition was first given a "preliminary review." *See* Exh. 35 at BPH–45. At this stage, according to Exhibit 35, the petition could be "Summarily Denied" if (1) the prisoner was seeking to advance the wrong type of hearing,[30] (2) the petition was not timely or (3) the petition contained "[n]o evidence of new information or a change in circumstances warranting further review." *Id.* The first two reasons were plainly jurisdictional, in that such petitions were not within the statute. *See* Exh. 38 at BPH–12 (BPH training material) (admitted at RT 210).

50. As for the third issue, the training provided to the decision-makers states that the prisoner first had to *assert* that there was "new information" or a "change in circumstances" without regard to any showing or assertion of suitability. *See* Exh. 38 at BPH–14. In other words, a mere showing of suitability was not sufficient to warrant an advance hearing; there had to be, in addition, some "new information" or "change in circumstances." *See also* Exh. 40 (admitted at RT 211) (ECF No. 341–8) at BPH–36 (defendants' explanation of "preliminary review" states that "[m]inimally, the prisoner must make a valid assertion of a change in circumstances or new information in order to avoid the BPH summarily denying the petition").

51. In addition to that assertion (of changed circumstances or new evidence), the prisoner then had to *establish*, still in

---

**29.** The form was amended on March 1, 2014, although it appears that prisoners still fill out Exhibit 35. However, the decision-makers now use Exhibit 2B instead. (RT 265–66.).

**30.** For example, there are medical parole suitability hearings, documentation hearings and progress hearings, none of which are included in the advance hearing process. (RT 275.).

the "preliminary review" stage, that there was a "reasonable likelihood" that the prisoner no longer required additional incarceration. *See* Exh. 38 at BPH–15. The petition would be "Summarily Denied" if "other evidence shows" that the prisoner was "unsuitable for parole despite the change in circumstances" or "new information." *Id.*

52. The "full review" required the prisoner to again establish "a reasonable likelihood," considering the safety of the public and victim, that the prisoner no longer required incarceration. *See* Exh. 38 at BPH–17.

53. After March 1, 2014, the decision-making process was changed. Instead of a "preliminary review" followed by a "full review," there is now a "jurisdictional review," followed by a "full review." (RT 272) (Shaffer Testimony).

54. The jurisdictional review is conducted by legal analysts, and determines only whether to screen out petitions where (1) the prisoner was seeking to advance the wrong type of hearing, 30 or (2) the petition was not timely. (RT 272–73.)

55. The jurisdictional review does not involve any determination on the merits. (RT 276.) This is in contrast to the pre-March 1, 2014 procedure, in which the "preliminary review" included a merits determination on whether the prisoner had shown a change of circumstances warranting further review. *See, e.g.,* Exh. 38 of BPH–145.

56. If the petition survives the jurisdictional review, it moves to a "full review," which is a merits review conducted by a Commissioner or Deputy Commissioner. (RT 277–83.) This review is conducted based upon documents, possibly including the prisoner's "central file," or some portion of it, and does not include a hearing. (RT 284–308.)

57. The standard for advancing a hearing is whether there is a "reasonable likelihood that additional incarceration, after consideration of the public safety and the [victim's] safety, is no longer necessary." (RT 284.) It is not the suitability standard.[31] (RT at 288.)

58. When the PTA is submitted, the Board places a hold on a hearing date 9 months from that date, in order to ensure that a hearing date will be available if the PTA is granted. (RT 277–78.) Accordingly, a prisoner who wishes to have a new hearing in a year must file the PTA immediately, but in any event, no later than 3 months from the date of the parole denial. Thus, the inmate can use at most 3 months worth of "changed circumstances" or "new information" to convince the decision-maker to grant him an advance hearing. Accordingly, whatever work the inmate does in the subsequent 9 months is not considered.

59. The inmate may file a new petition to advance no sooner than three years after the last petition to advance was denied. (RT 274–75.)

60. Although the Board has the authority to grant an advanced hearing *sua sponte*, it has never done so, because until recently, there has been no process for doing so. *See* RT 297.

61. *Post–Vicks,* the Board is apparently implementing a procedure to implement sua sponte reviews. (RT 289–95). The board is currently conducting *sua sponte* reviews, although as of the date of Shaf-

---

**31.** The standard for suitability is:

> The panel or the Board, sitting en banc, shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual.

Cal.Penal Code § 3041(b).

fer's testimony, none had ever been granted. (RT 289–95, 297–98.)

### B. Advance Hearing Examples.

The parties have directed the court's attention to several examples of the petition to advance process. Some of the examples point to cases where advanced hearings were granted or denied, and appear to show that the advance hearing process *can* afford prisoners an opportunity to avoid the *ex post facto* problems associated with Proposition 9.[32]

Other examples show the Petition to Advance ("PTA") process identifying prisoners whose PTAs apparently ought to be denied. For example, T. Faatiliga's advance hearing petition made it past the preliminary review stage. *See* Exh. 80, Vol. 2, at BPH–22042 (full review ordered on April 5, 2011). At the full review stage, the petition was denied, for the following reasons:

Although the inmate has remained disciplinary free, earned 6 laudatory chronos, and provided a letter regarding insight and remorse, he has only participated in 2 additional self help programs since his last review. He attended a one day program on victim recognition, reflection and healing on 11–10–10 and has continued his participation in the YAPP program. The transcripts indicate the panel would like him to participate in an anger management program as well and to continue self help that would further improve his level of insight.

*Id.* This advance petition denial appears to squarely address the issue presented, that is, whether the inmate should get an advance hearing. The decision-maker denied the petition because the prisoner had not done what the last panel indicated he should do before he could be ready for release, namely, "participate in an anger management program." [33] These exam-

---

**32.** *See, e.g.,* R. Evans (petition to advance granted, denied parole), UF ¶ 8; L. Gooseberry (petition to advance granted, and parole granted after some voluntary deferrals), UF ¶ 9; J. Martinez (petition to advance granted, parole granted), UF ¶ 10; R. Singh (petition to advance granted after prisoner stipulated to 3–year deferral, parole denied), UF ¶ 11; D. Vanlandingham (petition to advance granted, parole granted, Governor reversed, parole again granted), UF ¶ 12.

**33.** Similar examples are: D. Washington (Exh. 80 at Y 25025) (prisoner failed to address issues identified at the last parole hearings); D. Plata (Exh. 80 at Y 20560) (same); T. Porter (Exh. 80 at Y 33758) (prisoner failed to document participation in a program apparently); S. Mendoza (Exh. 80 at Y 18391) (denial fully explained, addressed relevant factors); M. Heller (Exh. 80 at Y 18481) (level of insight is improving but "still deemed inadequate"); R. Holguin (Exh. 80 at Y 30144) (recent disciplinary incidents); B. Werner (Exh. 80 at Y 25063) (continued failure of "insight"); T. Cobos (Exh. 80 at Y 12776) (continued failure of "insight," superficial comments to the contrary are not enough); A.

Monteon (Exh. 80 at Y 18674) (inmate was untruthful in evaluation); M. Loveless (Exh. 80 at Y 17242) (petition failed to address concerns of last panel); R. Elam (Exh. 80 at Y 13861) (inmate failed to update parole plans, as asked for by prior panel).

Plaintiffs have identified several examples where they disagree substantively with the decision-maker, even though they do not identify any structural problem with the decision. *See, e.g.,* E. Sanders (Exh. 48 (binder) at BPH–3499) (plaintiffs assert that the decision-maker "discounts" prior panel's comments that the prisoner is close to suitability); F. Salas (Exh. 47 (binder) at BPH–1491) (plaintiffs say that the decision-maker denied PTA even though prisoner completed relevant courses and was a great student); and Dawn Ayres (Exh. 80 at Y 10180) (plaintiffs apparently feel that the inmate's 400 pages of documentation should have resulted in a grant of parole).

However, this court does not sit to review individual parole decisions. The question here is not whether the decision-makers reached the correct decision or not. The question is whether the system in which they

ples tend to show that the PTA system works at denying petitions that ought to be denied. The remaining question is whether it grants petitions that ought to be granted.

Several examples show that even when the Board decides a case under an apparently reasonable interpretation of Proposition 9 and the implementing regulations, the advance hearing process can be rendered meaningless or illusory. The most profound failure of this process is in the Board's apparent interpretation of the statute authorizing advance petitions. The statute provides that the inmate may request an advance hearing by submitting a petition that sets forth "the change in circumstances or new information that establishes a reasonable likelihood that consideration of the public safety does not require the additional period of incarceration of the inmate." Cal.Penal Code § 3041.5(d)(1). A sensible interpretation of this authorization is that the "change in circumstances or new information" is *tied* to the question of suitability for parole.

However, some examples identified by plaintiffs show that the Board has interpreted the authorization in a way that

separates the "change in circumstances or new information" from the question of suitability. Rather, the Board requires a showing of "change in circumstances or new information" before it will even consider the question of suitability for parole. This is a problem first because the most fundamental change in circumstances would be a move from unsuitability to suitability. But as the examples show, that is apparently not a change in circumstance that will satisfy the Board. Second, when this requirement is spun off from the suitability requirement, it imposes an additional, substantive burden on the prisoner's ability to obtain parole.

This is not a harmless procedural change. This is a change that says that the prisoner must now show something that he never had to show before, namely, this amorphous "change in circumstances or new information." At the time the crime was committed, the sentence was incarceration until such time as the Board determined that the prisoner was suitable for parole. Under Proposition 9, it is incarceration indefinitely, unless the Board finds clear and convincing evidence of (a) a

---

make their decisions is enough to rescue Proposition 9 from its *ex post facto* problems. In the case of J. Barajas (Exh. 80 at Y 10820), plaintiffs complain that the petition was denied because the decision-maker determined that "more time" is needed. This court knows of no reason that the decision-maker cannot *independently* determine that more time is needed, as apparently was the case here. The same applies to: T. Tuvalu (Exh. 80 at Y 24699) ("[a]nything less than three years would be insufficient"); J. Stephen (Exh. 80 at Y 15973) ("additional time is needed to evaluate ,[inmate's recent] gains/knowledge and understanding in this area"); S. Sevior (Exh. 80 at Y 23514) (not enough time has elapsed for prisoner to work on his anger); I. Verdugo (Exh. 80 at Y 35615) ("[a]lthough his programming is positive a longer period of time to participate and fully understand and use the concepts is need-

ed"); A. Cook (Exh. 80 at Y 28003) ("[w]hile his ongoing participation in self help is commendable, the extent and length of his involvement remains inadequate in light of the prior panel's comments as to lack of insight and remorse"); J. Kuhnke (Exh. 80 at Y 31650) ("[i]t is believed that Mr. [Kuhnke] needs more time to continue on this positive path to lay a stronger foundation to insure that he is not a public safety risk when released into the free community"); and L. Haynes (Exh. 80 at Y 17145) ("it is still an inadequate amount of time in terms of ongoing participation in these self-help groups") (the court notes that he was also denied because his parole plans were "barely adequate, and does not mention a plan for staying out of the gang lifestyle").

This is a different matter than if the decision-maker were to simply rely on the prior panel's determination that more time is needed.

change in circumstances or new information, *and separately,* (b) suitability.

### (1) M. Brodheim: Change in Circumstances or New Evidence.

Plaintiffs have directed the court's attention to the case of M. Brodheim as an example of the advance hearing process in action.[34] At a parole hearing on June 4, 2009, the Board denied parole for Brodheim, and deferred his next hearing for the minimum 3–year period allowed under Proposition 9. *See* Exhibit 80, Vol. 2 at BPH–21458. On November 1, 2010, this court granted Brodheim's habeas corpus petition on the ground that the record did not contain "some evidence" of Brodheim's current or future dangerousness. *Id.* at BPH 21468. This court ordered Brodheim released within 45 days unless the Board conducted a new suitability hearing in accordance with Due Process and the court's order. *Id.* The board scheduled the new hearing for December 1, 2010. At that hearing, the Board found that Brodheim was suitable for parole. *Id.* at BPH 21567. However, on March 15, 2011, the Ninth Circuit reversed this court's order, citing the intervening authority of *Swarthout v. Cooke,* 562 U.S. 216, 131 S.Ct. 859, 178 L.Ed.2d 732 (2011) *(per curiam). Id.* at BPH–21459–60. Even though the Board had already found Brodheim suitable for parole, it immediately (March 18, 2011) vacated its decision, solely because the earlier-than-planned—but already conducted—December 2010 hearing was no longer legally required. *Id.* at BPH 21458. *Id.* The board re-instated the 3–year deferral of the original hearing. *Id.* The board did not state or otherwise indicate that it had substantively changed its view, or had decided that Brodheim was no longer suitable for parole. Rather, the decision was

vacated solely because it was held at an earlier date than was found to be legally required.

On April 20, 2011, Brodheim filed a petition to advance his hearing. *Id.* at BPH 21462. Brodheim relied, among other things, upon the transcript from the December 10, 2011 hearing at which the Board had already found that he was suitable for parole. *Id.* On May 11, 2011, the Board "Summarily Denied" Brodheim's petition, on the boilerplate grounds that there was "[n]o evidence of new information or a change in circumstances warranting further review." *Id.* at BPH 21463.

From the Brodheim example, the court infers that the Advanced Hearing process requires the inmate to make a showing beyond simple "suitability" for parole. Rather, the inmate must, in addition, show "new information or a change in circumstances" from the last parole denial.

The inference is supported by the Board's training manual and instructions to decision-makers. *See* Exhibit 40 (ECF No. 341–8). The manual makes clear that in order to pass "preliminary review," the prisoner must make the assertion that there are "changed circumstances" or "new information." *Id.*, at BPH–36. Only once this assertion has been made does the petition survive summary denial, and the Board go on to determine whether those changed circumstances or new information establish whether additional incarceration is required. *See id.*

Examples of the "change in circumstances" or "new information" that would enable a prisoner to avoid summary denial are having updated or stable parole plans, job offers, vocational or educational certificates, completion of self help and/or drug or other treatment programs, or changed

---

**34.** There appear to be over 40,000 pages of advance hearing documents in Plaintiffs' Exhibit 80 (submitted on two CD's). It is not practical for the court to review them all, so the court considers only the documents specifically brought to its attention by the parties.

outcome of disciplinary actions. *See* Exhibit 42 (ECF No. 341–10) at BPH–33. Although this list is stated to be not exclusive, it does appear to consist of things in a different category than, for example, the mere passage of an additional year of incarceration.[35]

### (2) T. Nguyen: The Next Panel Should Decide.

In another set of examples, the decision-maker made no finding on whether the prisoner had shown a reasonable likelihood that further incarceration was not needed, and therefore the next parole hearing should be advanced, even though that was the only question he had to decide.[36] Rather, they determined that this was a question for the next parole review panel. Yet, the decision-maker denied the prisoner the opportunity to get to the next review panel until the original deferral period had elapsed. These examples tend to show that some PTA decision-makers viewed certain issues as categorically exempt from the PTA process, and therefore

could only be decided by panels after the deferral period imposed by the last panel. In fact, there is no such categorical exemption in the law or regulations. In such cases, the PTA process was illusory.

T. Nguyen's advance hearing petition, for example, made it past the preliminary review stage. *See* Exh. 80 at Exh. Y 19163 (full review ordered on February 21, 2012). At the full review stage, the petition was denied. *Id.* (April 25, 2012). The reason for the denial was:

> Prior panel's primary factor that tend to show unsuitability . . . was his past and present mental state and attitude towards the crime. These concerns need to be address[ed] by the panel and will be at next hearing. All other areas continue to be positive.

*Id.* at 19164.[37]

### (3) M. Killingsworth: Comprehensive Risk Assessment.

A structural barrier to a meaningful PTA process is the Comprehensive Risk

---

**35.** As another example, J. Kyne was denied parole on June 18, 2009. Exh. 45 (binder). On August 9, 2010, he filed a PTA. Submitted with the PTA was a large volume of documentation that, even under the most skeptical and jaundiced eye, clearly presents new information and changed circumstances that addressed his suitability for parole (although of course, they do not compel a conclusion one way or another). His PTA was summarily denied, on the grounds that it failed to present new information or changed circumstances. There is no other explanation for the summary denial.

Similar results are: J. Ferioli (Exh. 80 at Exh. Y 29405) (at full review, the sole reason for denying the PTA was that, while the prisoner was doing well, "there is insufficient reason/change of circumstances to warrant advancing the date of the suitability hearing, as such"); C. Chruniak (Exh. 80 at Y 27915) (at full review, decision-maker denies PTA because although the prisoner is doing well, he demonstrated "neither new information nor changed circumstances").

**36.** In denying the petition, the decision-maker checks the box next to the following paragraph:

> Denied, after conducting a review of the case factors and considering the new information of change in circumstances, the prisoner did not establish a reasonable likelihood that consideration of the public and victim's safety does not require the additional incarceration.

*See, e.g.* Exh. 80 at Exh. Y 25932. However, the Board appears to concede that this boilerplate language does not actually give the *reason* the advance petition was denied. *See* RT 267 ("a lot of decisions were going back to inmates . . . saying summarily denied, and it didn't give enough reason to explain our decision . . . [s] we expanded that"). The actual reason is given in the "Comments" section.

**37.** Similar denials occurred in the other cases: K.E. Woods (Exh. 80 at Y 25932) (last panel's concerns must be evaluated "by a future panel"); K. Blackman (Exh. 80 at Y 11362) ("the [panel's] concerns that not enough time has elapsed since his last CDC

Assessment ("CRA"). The CRA is one factor the decision-maker must consider in determining whether to grant an advance hearing petition (RT 284). The CRA is completed every five (5) years. Cal.Code Regs. tit. 15, § 2240(b). A Subsequent Risk Assessment ("SRA") can be made before any regularly scheduled hearing. There are two problems here. First, the SRA "will not include an opinion regarding the inmate's potential for future violence because it supplements, but does not replace, the Comprehensive Risk Assessment." *Id.*, § 2240. Second, there is no authorization for the CRA or the SRA to be issued for a PTA. Under the regulations, these reports are prepared in advance of a *hearing,* not a *request* for a hearing. Plaintiffs therefore argue that "any prisoner who is denied parole in part because of the CRA has no chance of obtaining an advanced hearing." Plaintiff's Summation (ECF No. 517) at 25 n. 37.

The undisputed examples identified by plaintiffs support this assertion. For example, M. Killingsworth's advance hearing petition made it past the preliminary review stage. *See* Exh. 80 at Exh. Y 17970 (full review ordered on June 28, 2011). At the full review stage, the petition was denied, for the following reasons:

> I/M Killingsworth is to be commended for his additional/continued participation in self help programming and disciplinary free behavior. The panel's concerns with the psychiatric evaluation completed by Dr. Smith in August 2008 indicat-

ing that P presents a moderate risk of violence are still valid.

*Id.* at 17971. This denial does appear to address squarely the question presented, that is, whether considerations of public and victim safety indicate that the prisoner should be granted an advanced hearing. The decision-maker denied the petition, finding that the concerns about the prisoner's "moderate risk of violence" were still valid.

However, the psychiatric evaluation it relies upon, addressing risk assessment, is completed only every five years, so there would appear to be no way for the prisoner to show that circumstances have changed. Moreover, since this is only a *request* for a hearing, the prisoner does not even have the right to obtain a supplemental risk assessment report.[38]

### (4) A. Mendoza: Translation Services Unavailable.

Another structural barrier to making the PTA anything other than an illusory benefit is the apparent inability of the decision-makers to get documents translated in time for them to rule on the petition. For example, A. Mendoza's advance hearing petition made it past the preliminary review stage. *See* Exh. 80 at Exh. Y 32900 (full review ordered on June 28, 2011). At the full review stage, the petition was denied because some of the documents the prisoner submitted were in Spanish, and the decision-maker therefore could not determine whether the standard

---

115 and counseling chronos has not changed").

**38.** Other examples of this result are: V. Pleitez (Exh. 80 at Y 20606) (at full review, decision-maker states, "[i]f new CRA is found reschedule inmate for full review"); W. Crawford (Exh. 80 at Y 13359) (at full review, decision-maker states the prisoner "submitted nothing to document any change in these

important areas" identified in the CRA); B. Jimenez (Exh. 80 at Y 11616) (at full review, decision-maker states "[a] new psychiatric evaluation has not been completed; hereby reflecting no change to the major reasons for the unsuitability determination," namely, the risk assessment); J. Stevenson (Exh. 80 at Y 24063) (at full review, advance hearing is denied based upon "unresolved issues" identified by the CRA).

had been met until the documents were translated. *Id.* at Y 32901.

This situation appears to contradict the testimony that prisoners who need assistance receive such assistance in preparing their petitions to advance. (*See* RT 273.) If in fact, no translation services are provided at the PTA stage, then the PTA process is illusory for those prisoners who communicate only in Spanish.[39]

## C. Conclusions.

The evidence shows that the advance hearing process sometimes works and sometimes does not work. It certainly appears to deny advance hearings where there is good cause to deny them.

However, the PTA appears to deny advance hearings even to those who facially appear to deserve them. The evidence shows that the Board interprets Proposition 9 to impose a substantive new "changed circumstances" or "new information" requirement on prisoners, separate and apart from the requirement that they show suitability. The PTA decision-makers rely on CRA's to determine whether to even grant an advance hearing, even though no new CRA can be done earlier than five years from the last one, and no SRA is available for a hearing *request*, like the PTA. The board apparently fails to provide translation services for the PTA process. Finally, the PTA decision-makers from time to time, simply rely on the

last panel's assessments about whether the prisoner is ready for parole, and deny advance hearings because they think another panel should decide the question.

Thus, these PTA process's failings appear to be built in to the PTA system, rather than simply resulting from occasional errors. The PTA process is structured such that it fails, in many cases, to afford inmates a fair opportunity to obtain an advance hearing. All told, the PTA process is not sufficient to protect inmates from the *ex post facto* problems inherent in Proposition 9.

## III. PROPOSITION 89

### A. Findings of Facts.

62. On November 4, 1988, California voters approved Proposition 89, which granted the Governor the ability to reverse the decisions of the parole board regarding prisoners convicted of murder. 1988 Cal. Legis. Serv. Prop. 89 (West).

63. Proposition 89 is neutral on its face, allowing the Governor to reverse parole grants and denials alike. *Id.*

64. However, its intent was stated to be to give the Governor "the power to block the parole of convicted murderers." Exh. 72 (ECF No. 428–9) (Proposition 89 Ballot Pamphlet (Argument in Favor of Proposition 89)) at 46 (admitted per PTO).[40] Intending to "correct a weakness

---

**39.** Plaintiffs also complain that inmates are denied parole because of "classification scores." ECF No. 517 at 28–29. However, this appears to have no bearing on the value of the PTA process. Classification scores apparently arise from the inmate's behavior in prison. If a prisoner is denied parole because he has spent the first 20 years in prison conducting gang activities, and is classified pursuant to those activities, that is a matter unrelated to the validity of the PTA process.

**40.** In California, "[b]allot summaries ... in the 'Voter Information Guide' are recognized

sources for determining the voters' intent." *Perry v. Brown,* 671 F.3d 1052, 1090 n. 25 (9th Cir.2012), *vacated on standing grounds sub nom., Hollingsworth v. Perry,* 570 U.S. ——, 133 S.Ct. 2652, 186 L.Ed.2d 768 (2013); *Hodges v. Superior Court,* 21 Cal.4th 109, 114 & 115–18, 86 Cal.Rptr.2d 884, 980 P.2d 433 (1999) ("the voters should get what they enacted, not more and not less. In this matter, therefore, we are obliged to interrogate the electorate's purpose, as indicated in the ballot arguments and elsewhere").

in the state's parole system," Proposition 89 would, according to its proponents, "provide an extra measure of safety to law-abiding citizens by giving the Governor the authority to block the parole of criminals who still pose a significant threat to society." Exh. 72 at 47 (Rebuttal to Argument Against Proposition 89).

65. In 2007, Governor Schwarzenegger reviewed 172 decisions by the Board granting parole; the Governor reversed 115 (66.9%) of those decisions, he referred 18 (10.5%) to the Board to review the cases *en banc,* he modified 2 decisions (1.1%), and he declined to review 37 decisions (21.5%). In 2008, Governor Schwarzenegger reviewed 170 decisions by the Board granting parole; the Governor reversed 81 (47.6%) of those decisions, he referred 33 (19.4%) to the Board to review the cases *en banc,* he affirmed 1 decision (0.6%), and he declined to review 55 decisions (32.4%). In 2009, the former Governor reviewed 454 decisions by the Board granting parole, the Governor reversed 285 (62.8%) of those decisions, he referred 49 (10.8%) to the Board to review the cases en banc, he modified 2 decisions (0.4%), and he declined to review 118 decisions (26%). In 2010, the former Governor reviewed 503 decisions by the Board granting parole, the Governor reversed 290 (57.7%) of those decisions, he referred 58 (11.5%) to the Board to review the cases en banc, he modified 3 decisions (0.6%), and he declined to review 152 decisions (30.2%). UF ¶ 17.

66. Between January 2007 and December 2010, the Governor referred 158 cases in which the Board had granted parole to the prisoner back to the Board for en banc consideration; following the referral for *en banc* consideration, 153 (97%) of the cases resulted in the prisoners' release, either because the *en banc* Board affirmed the grant of parole or the *en banc* Board sent the matter to rescission but the panel voted not to rescind. UF ¶ 18.

67. During the review process, the chief counsel (or designee) prepares a written report ("Executive Case Summary" or "ECS") on each case in which parole has been granted, which includes: (1) an overview of the prisoner's central prison files as well as the evidence and the findings from the hearing that resulted in a parole grant; (2) information about the prisoner's term as set by the panel that granted parole; and (3) the calculated release date for the prisoner based on that term. UF ¶ 3.

68. The evidence presented at trial shows that Proposition 89 was carried out consistent with its intent. Plaintiffs' Exhibit 67 (admitted over objection at RT 164), is a summary listing of all grants of parole during the years 1999 to 2011, to life prisoners. RT 164–68. "Release now" means that by the time the parole grant came through, the inmate had already served his life term, and could be paroled immediately, that is, after finalization (120 days) and gubernatorial review (30 days). *Id.*

69. Exhibit 68 (admitted over objection at RT 170), is a summary of Exhibit 67, without the names and individual information. Exhibit 69 (admitted at RT 205), is a summary of the governor's modifications of life parole grants. Exhibit 77 (admitted at RT 175), is a summary of every parole decision that the Governor reviewed.

70. Executive Case Summaries are prepared when the parole board grants parole to a life prisoner. RT 206 (Knox testimony). Exhibit 71 (admitted over objection at RT 207), is an example of such a summary.

71. In 1991, the Governor requested that all parole grants involving murder convictions be forwarded to the Governor's

office for review. Exh. 75 (admitted at RT 176). There is no evidence that the governor requested the review of any parole denials, nor that there was any process to get such decisions to the governor for review.

72. Of the parole grant reversals, most were of prisoners who were already beyond their "life terms," so that but for Proposition 89 and the Governor's reversal, they would have been released already. *See* Exh. 67.[41]

73. The Executive Reports on Parole Review Decisions reflect that, for the 21–year period from 1991 through 2011, the Governor reported reviewing only three decisions denying parole, affirming all three denials. UF ¶ 23. *See* Exh. A at 383 (D. Sanders, Nov. 2002, Gov.Davis), 517 (P. Agrio, Apr. 2003, Gov. Davis), 893 (M.Lindley, Dec. 2003, Gov. Schwarzenegger).

74. The Governor fulfills the reporting mandate of Proposition 89 by annually filing the "Executive Report on Parole Review Decisions for the State of California." UF ¶ 24.

75. The Executive Reports show that in the twenty-year period from 1991 through 2010, the Governor reversed more than 70 percent of the grants of parole made to prisoners with murder convictions. UF ¶ 25.

### B. Conclusions

The facts are essentially undisputed. The court reviews, once again, the law of *ex post facto,* but in light of this evidence. The inquiry for the court is whether Proposition 89 has created a "significant risk" of longer incarceration for life prisoners whose crimes were committed before the law's passage. I find that it does.

### 1. Is plaintiffs' challenge foreclosed by *Biggs?*

Defendants assert that plaintiffs' *ex post facto* challenge to Proposition 89 fails as a matter of law. ECF No. 516 at 18. They argue that Supreme Court and Ninth Circuit precedent forecloses plaintiffs' challenge. This court has already rejected defendants' argument to the degree it is based upon *Collins v. Youngblood,* 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990), *Mallett v. North Carolina,* 181 U.S. 589, 21 S.Ct. 730, 45 L.Ed. 1015 (1901), *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), *Garner v. Jones,* 529 U.S. 244, 120 S.Ct. 1362, 146 L.Ed.2d 236 (2000), and *Johnson v. Gomez,* 92 F.3d 964 (9th Cir.1996), *cert. denied,* 520 U.S. 1242, 117 S.Ct. 1848, 137 L.Ed.2d 1050 (1997). *See Gilman v. Brown,* 2013 WL 1904424 at *11–*15 (E.D.Cal.2013) (Karlton, J.). Reviewing those cases in light of the evidence presented at trial, the court sees no basis for changing its views.

This court concluded that under *Johnson v. Gomez,* no facial challenge to Proposition 89 can succeed in light of the cited cases, as the new law "simply removes final parole decision-making authority from the BPT and places it in the hands of the governor." *Johnson v. Gomez,* 92 F.3d at 967. The facial challenge was only one route plaintiffs had available to challenge Proposition 89. The Ninth Circuit has made clear that plaintiffs could nevertheless succeed on the merits of their challenge if they:

> can "demonstrate, by evidence drawn from [Proposition 9's] practical implementation ..., that its retroactive application will result in a longer period of

---

**41.** Plaintiffs say 90% were beyond their release dates (ECF No. 517 at 42), a percentage defendant does not dispute. The court has not done the count and calculation, but the raw numbers are available in Exhibit 67.

incarceration than under the [prior law]."

*Gilman,* 638 F.3d at 1106 (quoting *Garner,* 529 U.S. at 255, 120 S.Ct. 1362).[42]

Defendants argue that the possibility of an "as-applied" challenge, expressly recognized by the Ninth Circuit in *Gilman,* has now been foreclosed, as matter of law, by *Biggs v. Secretary of the California Dept. of Corrections and Rehabilitation,* 717 F.3d 678 (9th Cir.2013), a *habeas* case decided under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d). Defendants' argument appears wrong on several levels.

First, the argument simply assumes that *Biggs* overruled *Gilman.* In fact, panels of the Ninth Circuit do not overrule each other, at least not in the absence of intervening Supreme Court, *en banc* or statutory authority. *Montana v. Johnson,* 738 F.2d 1074, 1077 (9th Cir.1984). This court knows of no such intervening authority. Second, *Biggs* does not even purport to overrule *Gilman.* Indeed, its only reference to *Gilman* is to reiterate that:

> in *Gilman v. Schwarzenegger,* we said that the plaintiffs could succeed on their *Ex Post Facto* Clause claim through an evidentiary demonstration that retroactive application of the change in law in question would result in increased incarceration time, citing *Garner.* 638 F.3d 1101, 1106 (9th Cir.2011).

*Biggs,* 717 F.3d at 692. Third, *Biggs* distinguishes *Gilman* on the very point that defendants say is of "no moment," namely, that *Biggs* is an AEDPA case, while *Gilman* is a Section 1983 case. *Id.* ("But Gilman was a § 1983 case, *id.* at 1105, and thus contained no holding about clearly established federal law"). Because *Biggs* was an AEDPA case, the question presented was not whether plaintiff could make an

"as-applied" challenge to Proposition 89. The question was whether the California Supreme Court had failed to apply "clearly established federal law" by not subjecting Proposition 89 to an as-applied analysis. *Biggs* found that no such analysis was *required* by clearly established Supreme Court law:

> The Supreme Court did not clearly establish in *Garner* that an as-applied analysis of the significance of the risk of increased punishment is required with regard to the retroactive application of a change in law like California's gubernatorial review of parole board decisions. The California Supreme Court's decision in [*In re*] *Rosenkrantz* [29 Cal.4th 616, 128 Cal.Rptr.2d 104, 59 P.3d 174 (2002) ] was thus not an unreasonable application of clearly established federal law, and neither was the Superior Court's decision in Biggs' case that relied on it.

*Biggs,* 717 F.3d at 693. That is not at all the same as saying that such an analysis is now *foreclosed* in a Section 1983 case.

## 2. Proposition 89 violates the *Ex Post Facto* Clause.

■ Turning to the evidence presented at trial, it is clear that Proposition 89, in actual practice, is not the "neutral" transfer of final decision-making authority from one decision-maker to another. In practice the governors have used it to tip the scales against parole. Every governor since passage of Proposition 89 has done this, and there is no evidence that this practice has stopped. Thus, while the governors could use the law to review parole decisions to ensure that they are accurate and fair, they appear to have no such concern about decisions that deny parole.

Prior to the new law, the sentence faced by class members was life with the possi-

---

42. *See Gilman,* 2013 WL 1904424 at *15–15 (plaintiffs are still entitled to go to trial so that they could make an "as-applied" challenge to

the law, "based upon the 'actual effect' of Proposition 89 on this class of plaintiffs") (citing *Garner* ).

bility of parole. The parameters for determining the grant or denial of parole was fixed in the statutes, and the length of the "life term" was fixed in the Board's regulations. The new law was passed in order to lengthen the amount of time class members would spend in prison by creating a new mechanism for withholding parole, namely, the governor's veto. True to the law's intentions, California governors have used the new law to withdraw the possibility of parole from most class members. In short, the voters did not simply switch the final decision-making authority from the Board to the Governor. They switched it with an instruction that the Governor should put his finger on the scale to correct a "weakness" they perceived to exist when the Board made the final decision, namely, too many murderers being paroled, too soon. The governors have carried out the people's will by putting their fingers on the scale and reversing 70% of parole grants for these class members.

There is no evidence presented here that the plaintiffs were ever entitled to a liberal application of the parole rules. However, they have always been entitled to a neutral interpretation of those rules. That is, whether the Board made the final decision, or the governor, or anyone else, they are required to apply the rules as directed by the statute and the California Constitution. When the governors put their fingers on the scale to obtain a result of longer prison sentences, regardless of the inmate's showing of suitability, they failed to apply the statute in a neutral manner. Whether or not this is a violation of California law is not for this court to say. However, it is a plain violation of the *ex post facto* clause as to those to inmates whose crimes were committed before Proposition 89.

There is no claim here that California cannot instruct the Governor to keep certain people in prison longer, or to place his finger on the scale when deciding the question. In general, states are free to experiment with parole however they see fit. However they may not experiment in such a way as to increase the quantum of punishment for those who committed their crimes *before* the new punishment went into effect.

## IV.  REMEDY

Plaintiffs' surviving requests are for (a) a declaration that defendants have denied plaintiffs' rights under the *Ex Post Facto* Clause of the U.S. Constitution, and (b) injunctive relief.

The court accordingly **DECLARES** that Proposition 9, as implemented by the Board, violates the *ex post facto* rights of the class members.

The court further **DECLARES** that Proposition 89, as implemented by the governors of California, violates the *ex post facto* rights of the class members.

The court orders injunctive relief as follows:

1.  Going forward, the Board shall apply Cal.Penal Code § 3041.5, as it existed prior to Proposition 9, to all class members. That is, all class members are entitled to a parole hearing annually, unless the Board finds, under former Section 3041.5(b) that a longer deferral period is warranted.

2.  The Governor of California shall refrain from imposing longer sentences on class members than are called for by application of the same factors the Board is required to consider, as provided for by Proposition 89.[43]

---

**43.** Defendants assert that no injunction is warranted because there is no evidence that the current Governor is violating the *Ex Post*

*Facto* Clause, or that future governors will do so. The only evidence before the court how-

This order is stayed for 31 days, and goes into effect immediately thereafter, unless a timely appeal is filed.

IT IS SO ORDERED.

## ORDER

Plaintiffs have noticed a motion to alter or amend this court's judgment, entered in accordance with its February 28, 2014 Order (ECF No. 532). Plaintiffs request that the court's judgment regarding Proposition 89 be changed to enjoin the Governor from "reversing or modifying grants of parole to class members when the reversal or modification would result in delaying the prisoner's release from custody beyond the release date calculated by the California Department of Corrections and Rehabilitation based on the term set by the Board of Parole Hearings at the time the prisoner was granted parole" (ECF No. 534).

The court has determined that this motion may be decided without the need for oral argument. The hearing on this motion, scheduled for April 7, 2014, is hereby **VACATED.**

The motion will be denied, as the court granted plaintiffs the full relief they requested regarding Proposition 89. The complaint requests an order requiring that "the Governor's review of parole decisions be based on the same factors the Board is required to consider, as required by Article V, Section 8(b) of the California Constitution, and Section 3401.2 of the California Penal Code." [Corrected] Fourth Amended Supplemental Complaint (ECF No. 175) ¶ 5.[1]

Accordingly, plaintiffs' motion (ECF No. 534) is **DENIED.**

It IS SO ORDERED.

DATED: March 10, 2014.

---

ever, is what all governors thus far have done, and there is no evidence of any change.

All other requests for relief are denied as moot (because based upon dismissed claims), or are beyond the power of this court to grant.

1. The court noted this limitation to plaintiffs' request for relief in its summary judgment order. *See* ECF No. 479 n. 49. While plaintiffs also requested "[s]uch other and further relief as may be just and proper," the court has already determined that relief beyond what it granted was "beyond the power of this court to grant." ECF No. 532 at 58 n. 7. Nothing in plaintiffs' motion papers shows that the court was incorrect in so holding.